UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROMPER ROOM INC., a Wisconsin Corporation,
ROMPER ROOM II INC., a Wisconsin Corporation,
GREG GERING and TAMMY GERING,

      Plaintiffs,

      v.                              Case No. 14-C-1217

WINMARK CORPORATION
a Minnesota Corporation,

      Defendant.

**AMENDED DECISION AND ORDER GRANTING
MOTION FOR PRELIMINARY INJUNCTION** [*]

This diversity action arises under the Wisconsin Fair Dealership Law (WFDL), Wis. Stats. § 135.01 *et seq*. The plaintiffs in the case, Romper Room, Inc. (Romper I), Romper Room II, Inc. (Romper II) and Greg and Tammy Gering, contracted with Defendant Winmark Corporation to operate Once Upon a Child (OUAC) franchise stores, which sell secondhand children's clothes and toys, in Green Bay and Appleton, Wisconsin. Plaintiffs are citizens of the State of Wisconsin and Winmark is a citizen of the state of Minnesota. Moreover, the amount in controversy exceeds $75,000. Accordingly, the court has jurisdiction under 28 U.S.C. § 1332.

**I. BACKGROUND**

Under the terms of the Franchise Agreements, "Franchisee will be in default and Franchisor may, at its option, terminate this agreement as provided herein if . . . (3) Franchisee or any of its

---

[*] This is a revised version of the decision and order entered by the court on October 10, 2014.

managers, directors, officers or majority shareholders are convicted of, or plead guilty to or no contest to (a) a charge of violating any law which adversely impacts upon the reputation of the franchised business or . . . (9) Franchisee is involved in any act or conduct which materially impairs the good will associated with the name 'Once Upon a Child' or any of the Marks or the Business System . . . ." (Affidavit of Tamara L. Harmon, Ex. A at 17, ECF No. 14-2 at 20.) In July 2014, Greg Gering was convicted of three counts of misdemeanor theft by fraud in violation of section 943.20(1)(d) of the Wisconsin Statutes. A newspaper article about the case carried the headline "Once Upon a Child owner sentenced to jail for BadgerCare fraud" and explicitly noted that Gering and his wife owned OUAC stores in Green Bay and Appleton. (*Id.*, Ex. G, ECF No. 14-3 at 11.)

BadgerCare is a government-subsidized health insurance program for Wisconsin citizens who earn too much to qualify for Medicaid but not enough to buy insurance without help. According to the newspaper account, Gering had collected more than $25,000 in BadgerCare benefits over three years despite earning more than $600,000 over that period. He was originally charged with three counts of felony medical assistance fraud in violation of section 49.49(1)(a), but pled guilty to the reduced misdemeanor charges pursuant to a plea agreement with the state. He was sentenced to 30 days in jail and ordered to pay $30,000 in fines.

The newspaper account appeared on July 18, 2014. On July 21, 2014, Winmark sent a letter to Plaintiffs notifying them of its intent to terminate the Franchise Agreements pursuant to the provision set forth above. Winmark stated in its letter that "the defaults are grounds for immediate termination under Section 15.B of the Green Bay and Appleton Franchise Agreements." Winmark also noted, however, that under Wisconsin law, it was required to give Plaintiffs 90 days notice of termination with 60 days to cure. Because it viewed the defaults as incurable, Winmark advised

2

Plaintiffs that the Green Bay Franchise Agreement and the Appleton Franchise Agreement would terminate effective October 22, 2014, without further notice from Winmark. (*Id.*, Ex. J, ECF No. 14-3 at 28-29.)

On October 1, 2014, Plaintiffs commenced this action against Winmark to enjoin it from terminating the Green Bay and Appleton Franchise Agreements. Plaintiffs allege that Winmark's attempt to terminate the Franchise Agreements violates the WFDL because it has failed to establish good cause for termination. Even if good cause could be shown, Plaintiffs contend that Winmark has violated the WFDL by failing to provide them "60 days in which to rectify any claimed deficiency" as required by section 135.04. Plaintiffs also claim Winmark is in breach of the Franchise Agreements because the software it is required to provide under the agreements has consistently underperformed. Presently before the court is Plaintiffs' motion for a preliminary injunction. Plaintiffs have asked the court to prohibit Winmark from terminating the Franchise Agreements during the pendency of the litigation.

## II. ANALYSIS

In deciding whether to grant a motion for a preliminary injunction, I am to engage in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008). In the threshold phase, a party seeking a preliminary injunction must satisfy three requirements. First, the moving party must show that absent a preliminary injunction, it will suffer irreparable harm. Second, the moving party must show that it has no adequate remedy at law. And third, the movant must show that its claim has some likelihood of succeeding on the merits. *Id.* at 1086.

If the moving party fails to demonstrate any one of these three threshold requirements, the injunction must be denied. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If, on the other hand, the moving party has established the three threshold requirements, the court then proceeds to the balancing phase of the analysis. *Id.* In the balancing phase, the court attempts to minimize the cost of potential error by balancing the nature and degree of the movant's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the 'public interest,'" *Girl Scouts of Manitou Council*, 549 F.3d at 1086 (*quoting Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986)). More specifically, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* In so doing, the court employs a sliding scale approach: "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)). "Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the "public interest")." *Id.* (citing *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)). Applying these standards to the record before me, I conclude that Plaintiffs' motion should be granted.

**A. Irreparable Harm and No Adequate Remedy At Law**

In determining whether a party is likely to suffer irreparable harm absent entry of an injunction, several factors have been identified as significant: (1) the plaintiff will become insolvent or any damage award would come too late to save the plaintiff's business; (2) the plaintiff cannot

fund its lawsuit against the defendant without the income from the business; (3) the nature of the plaintiff's losses make difficult or impossible any calculation of damages; and (4) damages may not be recoverable from the defendant because it might become insolvent before judgment can be entered. *Roland*, 749 F.2d at 386. Of these factors, only the fourth favors Winmark.

If a preliminary injunction is not entered, the franchises will be terminated within less than two weeks, and Plaintiffs will be forced to close their business. Even if the plaintiffs wanted to operate under another name, the non-compete provisions would force them to move at least eight or ten miles away from the franchise location–or any other OUAC location–or close for one or two years, depending on the Agreement. (Ex. A, at 19, ECF No. 14-2 at 22.) Plaintiffs' have long-term lease obligations at both stores which, of course, would continue to come due with no stream of income from which to pay them. For Plaintiffs Greg and Tammy Gering, income from their OUAC stores is their only source of income. Winmark alleges that they have another store from which they derive income, but the Gerings have denied other income and there is no evidence offered to support the assertion that there exists another source of income sufficient to meet their personal needs and the ongoing obligations related to the two OUAC stores.

The Gerings are not new owners. They have owned and operated OUAC stores for over ten years, and the stores constitute their livelihood. Because the income derived from the stores is essential to running them and meeting their obligations, terminating the dealership may well render them insolvent. It would also make difficult or impossible their ability to continue to fund their lawsuit. Attorneys who specialize in WFDL litigation command significant pay, and the expenses associated with litigating such a claim are substantial. If an injunction is not granted, Plaintiffs may be unable to vindicate their WFDL rights, assuming those rights would be violated by termination.

The nature of the losses Plaintiffs will likely sustain if an injunction is not granted also supports entry of an injunction. Calculating lost profits is always difficult and inexact, but if the stores close and then later are able to start back up, there will likely be a loss of good will and reputation, as well as uncertain lost profits. Retail stores depend on regular customers who, once forced to shop elsewhere, may be difficult to bring back. Employees who are laid off upon termination may also be difficult to bring back, especially if they have found new jobs. For all of these reasons, I find that the nature of the losses Plaintiffs are likely to suffer if an injunction is not granted make it difficult, if not impossible, to determine damages if they ultimately prevail.

This fact alone also means that they have no adequate remedy at law. If damages are unlikely to provide complete relief, the only meaningful remedy available is the one they seek in the form of a preliminary injunction. This conclusion finds further support in the WFDL itself. Section 135.065 creates a rebuttable presumption that any violation of the law will result in irreparable harm. That presumption is not overcome here. I therefore conclude that Plaintiffs have established both irreparable harm and no adequate remedy at law.

**B. Likelihood of Success on the Merits**

To grant a motion for a preliminary injunction, the court must also find that the plaintiff has "some likelihood of success on the merits." *Girl Scouts of Manitou Council*, 549 F.3d 1086. Plaintiffs claim that Winmark's termination of the Franchise Agreements is in clear violation of the WFDL, and it is to that law that I therefore turn.

The WFDL is intended to promote fair business relations between dealers and grantors of dealerships and the continuation of dealerships on a fair basis. Wis. Stat. § 135.025(2)(a). It protects dealers against unfair treatment by grantors who inherently hold superior economic and bargaining power by providing dealers with rights and remedies over and above those set forth in

6

the parties' contract or agreement. § 135.025(2)(b), (c).  More specifically, the WFDL prohibits grantors of dealerships in Wisconsin from terminating or substantially changing the competitive circumstances of the dealerships without just cause.  It also requires grantors to provide dealers at least 90 days notice of termination, cancellation, nonrenewal, or substantial change in competitive circumstances, and requires the notice to provide the dealer 60 days in which to rectify any claimed deficiency. § 135.04.  If the deficiency is rectified within the 60 days, the notice of termination is deemed void.

Plaintiffs contend that Winmark's termination letter violates two requirements of the WFDL. They claim that it fails to state good cause for the termination and, further, it fails to provide the required 60-day right to cure.  For this reason, Plaintiffs claim the letter is ineffective to terminate their franchises and they thus have a likelihood of success on the merits.

Having considered the arguments of counsel, I conclude that Plaintiffs have demonstrated some likelihood of success on the merits.  There is no dispute in this case that the parties' relationship is governed by the WFDL.  Winmark concedes, at least for purposes of the motion, that Plaintiffs are dealers and it is a grantor.  Winmark contends, however, that it is in compliance with the WFDL because its termination letter does state good cause for termination and no cure is possible.  Even if a cure were possible, Winmark contends that Plaintiffs have made no effort to cure their default, and so any failure to provide a right to cure is harmless.

Winmark argues that Greg Gering's conviction for misdemeanor theft by fraud constitutes good cause for terminating the Franchise Agreements with Plaintiffs.  The Agreements provide that a franchisee is in default if an owner is convicted of "violating any law which adversely impacts the reputation of the franchised business" or if the franchisee "is involved in any act or conduct which materially impairs the good will associated with the name 'Once Upon a Child' or any of the Marks

7

or the Business System." (Ex. A at 17, ECF No. 14-2 at 20.) It offers no evidence, however, that the name "Once Upon a Child" or any of its marks have been materially impaired. Winmark points to several isolated comments that were made within days after the newspaper story appeared, but it offers no evidence that would allow the court to determine that either its name or any of its marks suffered *material* impairment. There were only eight comments attached to the newspaper story, and only one mentions the store by name. Two were by former employees who had other negative comments about Greg Gering, and one was about the sentencing judge's name. (Ex. G, ECF No. 14-3 at 13-15.) Most of the comments were directed at Greg Gering personally, and there is no comment more than a day after the story appeared. Winmark also notes that it had one comment about the incident on its facebook page complaining of the fraud and expressing the hope that the Appleton and Green Bay stores would close. (Ex. I, ECF No. 14-3 at 23.)

Winmark also notes that earlier stories on the charges against Greg Gering had appeared in other news accounts, and has introduced evidence of other negative comments generated by the stories that have appeared on social media, two of which mention the stores by name. Winmark claims the story of Gering's conviction was shared, "liked," or commented upon over 800 times on various social media after it appeared. (Harmon Aff. ¶¶ 24-26, Ex. I, ECF No. 14.) Other than a handful of negative comments, however, Winmark has offered no evidence, such as surveys, that would tend to show any lasting damage to its franchise name or marks.

In contrast, Plaintiffs point to the fact that the sales at both stores have gone up since the newspaper story. They note that "sales during the annual back-to-school, Halloween, and winter clothing events have outpaced sales during the same events in 2013. The Green Bay and Appleton stores are both on track to achieve higher annual sales in 2014 than in 2013." (Pls.' Br. at 3, ECF

No. 7.)  Based on this evidence, it would not appear that Winmark can show material impairment of its name or marks.

It is also unclear that Gering's violation of the law "adversely impacts the reputation of the franchised business."  The plain meaning of the word "reputation" is "overall quality or character as seen or judged by people in general." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, 994 (10th ed. 1999).  It is not at all clear that this one-day story in a local newspaper about Gering's convictions adversely impacted OUAC's overall character as seen or judged by people in general.  Although OUAC was mentioned in the story, there was no suggestion that Gering had used the business to commit his crimes.  He failed to disclose the income he derived from the stores, and this has certainly harmed his reputation, at least in the minds of the limited number of people who know of the story and remember it.  But I cannot conclude from the record before me that the reputation of the franchised business has been adversely impacted in any long lasting or meaningful way.

Even aside from the language of the Franchise Agreements, there is also the question whether Gering's conviction amounts to good cause under the WFDL.  Good cause under the WFDL means "failure by a dealer to comply substantially with essential and reasonable requirements imposed on the dealer by the grantor . . . ." § 135.02(4)(a).  To be sure, a requirement that its franchisees avoid criminal violations is reasonable.  But is it necessary that any criminal conviction be treated as grounds for termination, regardless of other circumstances?  Of course, strict necessity is not the test.  But it would seem some connection with profitability or other important interest is required.  On this record, I am unable to say that Gering's conviction for misdemeanor theft constitutes good cause under the Franchise Agreements themselves or the WFDL.

9

Plaintiffs also argue that even if Winmark could establish good cause for termination, the notice fails because it did not provide Plaintiffs 60 days in which to cure the deficiency. Winmark takes the position that no cure is possible, but it is not clear that this is so. Some breaches may be so egregious that termination may be the only possible response, but it is not clear that conveying Gering's interest to his wife or another family member might not be sufficient here. Since Winmark took the position that no cure was possible, Gering took no steps to transfer his interest in the business. I am unable on this record to say that doing so would not be sufficient to cure the default on which termination is sought. Moreover, given Winmark's contention that no cure was possible, I do not find Gering's failure to do so by now dispositive of the question.

In sum, I find that Plaintiffs have established some likelihood of success on the merits. They have met the threshold showing needed to move on to the balancing phase.

**C. Balancing Phase**

Upon balancing the nature and degree of the Plaintiffs' injury and likelihood of prevailing at trial against the possible injury to Winmark, I conclude that the injunction should be granted. As noted above, termination of the Agreements means the loss of Plaintiffs' sole source of income. It also means the loss of employment to some thirty-two employees, possible insolvency and the loss of ongoing businesses. Winmark, on the other hand, has already suffered whatever damage is likely to occur. The short-lived publicity has passed, and Winmark has tried to sever its ties to the Gerings. No additional damage to its name or marks is likely to occur in the time it will take to resolve the case. Plaintiffs will continue to make the payments due under the agreement and comply with the remaining conditions. If they fail to do so, Winmark may seek to have the injunction vacated. On this record, the balance clearly falls in favor of the Plaintiffs.

### III.  CONCLUSION AND ORDER

Accordingly and for the reasons set forth above, Plaintiffs' motion for a preliminary injunction is granted.  Upon determination and posting of an appropriate bond, Winmark is enjoined from terminating the Franchise Agreements absent further order of the court.  The Clerk is directed to set this matter on the court's calendar for a telephone conference to discuss the amount of the bond within the next week.

**SO ORDERED** this   11th   day of October, 2014.

>s/ William C. Griesbach
>William C. Griesbach, Chief Judge
>United States District Court